[Cite as *McCombs v. Ohio Dept. of Dev. Disabilities*, 2022-Ohio-1035.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

Jerri L. McCombs, as the Personal
Representative and Guardian of [B.C.],    :

                                          :

          Plaintiff-Appellant/
          Cross-Appellee,                 :         No. 21AP-280
                                               (Ct. of Cl. No. 2019-00194JD)
                                          :
v.                                                (REGULAR CALENDAR)
                                          :
Ohio Department of Developmental
Disabilities,                             :

                                          :

          Defendant-Appellee/
          Cross-Appellant.                :


---

D E C I S I O N

Rendered on March 29, 2022

---

**On brief:** *Bordas & Bordas, PLLC, Geoffrey C. Brown*, and *Tyler J. Smith*, for appellant McCombs. **Argued:** *Geoffrey C. Brown.*

**On brief:** *Dave Yost*, Attorney General, *Eric A. Walker*, and *Amy S. Brown*, for appellee Ohio Department of Developmental Disabilities. **Argued:** *Eric A. Walker.*

---

APPEAL from the Court of Claims of Ohio

DORRIAN, J.

{¶ 1} Plaintiff-appellant/cross-appellee, Jerri L. McCombs, individually and as guardian of her adult son B.C., appeals from a judgment of the Court of Claims of Ohio that found defendant-appellee/cross-appellant, State of Ohio, through its Department of Developmental Disabilities ("ODDD"), vicariously liable for the actions of its employees in abusing and neglecting B.C. when he was a resident at the Cambridge Developmental Center ("CDC") and awarding $16,100 in damages. ODDD filed a notice of cross-appeal.

For the following reasons, we affirm in part and reverse in part the judgment of the Court of Claims and remand the matter to that court.

## I. Facts and Procedural History

{¶ 2}   B.C. is a 25-year-old man with diagnoses of autism, seizure disorder, intellectual disability, attention deficit and hyperactivity disorder, intermittent explosive disorder, obsessive compulsive disorder, and aphasia.  He underwent a craniotomy and cranioplasty in the past few years due to a traumatic brain injury.  B.C. functions in the moderate to severe range of intellectual disability and is non-verbal. (See CDC Psychological Evaluation conducted by Melissa M. Harger, Ph.D., Psychologist, CDC Physical Examination conducted by Dr. Chendraj, M.D., Physician, CDC Special Team Report and CDC Investigative Service Unit Reports of Investigation at Pltf.'s Ex. 31 at 235, 237 and 253, and Pltf.'s Exs. 1, 2, 5, 6, 9, 11, 13, 15, and 16 respectively.)  B.C. has limited speech, "but communicates best through picture form and through body language and facial expressions."  A CDC document titled "my individual plan," under a section titled "[h]ow I communicate and how I want you to communicate with me," indicates "[B.C.] rarely speaks and instead uses simple signs, facial expressions, gestures, body language, and sometimes aggressive behaviors such as pulling and grabbing to let others know what he wants and needs."  (Pltf.'s Ex. 31 at 255.)

{¶ 3}   On March 2, 2018, shortly before his 25th birthday, B.C. was admitted to CDC for stabilization of some of his behaviors.  CDC's mission is "[t]o provide rehabilitation services to the people that live here and ensure compliance with standards."  (Tr. Vol. II at 364.)  CDC is a habitation center that includes four cottages, each with two sides, A and B.  Each cottage has administrative offices in the hallway between the two sides.  Approximately 70 residents are housed in the cottages.  B.C. was housed in Steele Cottage, side A, with 11 other residents.

{¶ 4}   CDC developed a person-centered plan for B.C., which is a tool that is a summary of the comprehensive functional assessments from the interdisciplinary team.  The psychologist developed a behavioral-support strategy for B.C. to address target behaviors.  B.C.'s target behaviors included physical aggression, self-injurious behavior, taking property, especially food and beverages, ritualistic tendencies, including cleaning, and other inappropriate behaviors.  The day-to-day care was provided by therapeutic

program workers ("TPWs") who were trained to use positive supports and principles. The CDC Superintendent, Cathleen Ballinger, testified that "the slapping and * * * kicking and choking" of a resident constitutes abuse and was "strictly forbidden [at] CDC" and were not approved ways to control residents' behavior. (Tr. Vol. II at 437-38.) Any use of physical restraint was only permissible in a situation involving an imminent risk of harm.

{¶ 5} On behalf of B.C., appellant, as his mother and guardian, signed a document titled "client rights and individual complaint procedure," which stated, among other rights, the right to "[h]ave a clean *safe* place to live in." (Emphasis added.) (Pltf.'s Ex. 31 at 238.)

{¶ 6} On June 26, 2018, another CDC resident reported to a supervisor that TPW Dianna Stein had hit B.C., pulled his ear, and attempted to drag him. B.C. was examined by a nurse on June 26, 2018, but she did not find any visible injuries. Douglas Bachmann, an investigator at CDC investigated the claim. Bachmann watched the videotapes from surveillance cameras in the common areas as part of his investigation and determined that Stein had committed multiple acts of abuse on B.C. However, the videotape recorded over itself after 30 days, thus he could only investigate the prior 30 days. In the prior 30 days, however, Bachmann identified several acts of abuse and other TPWs who failed to report that abuse.

{¶ 7} The videotapes and Bachmann's reports demonstrated the following incidents:

> ➢ On June 9, 2018, at approximately 10:20 a.m., B.C. was in the dining room and grabbed Stein's keys and Stein choked B.C. with her right hand. Misty Kuczmarski watched the incident but did not intervene or report it. (Pltf.'s Report of Investigation, Ex. 1 at 7; Ex. 2 at 23; Video Ex. File No. 1.)

> ➢ On June 20, 2018, at approximately 12:32 p.m., B.C. took a bag of snacks out of Stein's purse and began eating. Stein approached B.C. and used her left hand to choke him while her right hand was on his bicep. (Video Ex. File No. 2.)

> ➢ On June 20, 2018, at approximately 12:51 p.m., B.C. ran outside and was standing by the dumpster. He was redirected inside and sitting in the day room in a recliner. Stein approached him from behind and hooked her arms around B.C.'s throat and lifted him up

and back while he was seated. Stein then walked around the recliner and slapped B.C. Kuczmarski witnessed the slap but did not report it. (Ex. 1 at 6-7.)

➢ On June 20, 2018, at approximately 2:18 p.m., TPWs Theresa Baker and Kuczmarski were seated at a table in the dining room looking at their cellphones. B.C. took a bottle of water from the table and drank it. After throwing away the bottle, B.C. approached Kuczmarski, who extended her left leg and kicked B.C. in his upper thigh/hip area. Baker and Kuczmarski laughed for approximately 23 seconds and then looked at their cellphones again. (Ex. 5 at 31, video not produced.)

➢ On June 21, 2018, at approximately 7:31 a.m., B.C. was washing dishes in the kitchen when Stein and Baker grabbed B.C. and grabbed his shirt in a way that constricted B.C.'s neck, and Stein dragged B.C. out of the kitchen by the back of his pants. (Ex. 1 at 4; Ex. 9 at 50; Video Ex. File No. 5, at approximately 54:30 mark.)

➢ On June 21, 2018, at approximately 8:12 a.m., Stein was seated at a dining room table with TPWs Baker, Jason Frattali, and Ashley Jasielum. B.C. approached on Stein's left and pointed to a bottle of water. Stein slapped B.C. on the arm/chest. No one reported the incident. (Ex. 1 at 5; Video Ex. File No. 3.)

➢ On June 21, 2018, at approximately 8:32 a.m., B.C. removed a piece of paper from the bulletin board in the dining room. Stein attempted to retrieve the paper. Baker also attempted to retrieve the paper. Stein slapped B.C. under the chin. Another CDC employee became involved, grabbed the paper, and pushed B.C. Stein and the employee trapped B.C. against a wall, forcefully grabbing and gripping his arm. The other employee shoved B.C. in the chest and then forced B.C. out of the room by pushing him in the back. B.C. re-entered the room. Stein and Baker circled and followed him. The other employee again trapped B.C. against a wall, then shoved him several times and pushed B.C. out of the room by pushing him in the back again. B.C. again re-enters the room, and Baker and Stein used chairs to corner B.C. and then Stein placed one hand

on B.C.'s shoulder and kneed him in the groin area. (Ex. 1 at 6; Video Ex. File No. 4.)

➤ On June 23, 2018, at approximately 7:18 a.m., B.C. was in the dining room when Stein forcefully slapped him in the back side of his head for wanting more orange juice. (Ex. 1 at 4; Video Ex. File No. 6.)

➤ On June 26, 2018, at approximately 7:42 a.m., B.C. picked up a bottle of water from a table in the dining room. Stein chased B.C. and slapped him in the back of the head as he was drinking. TPW Kelsey Clark did not intervene. Stein grabbed B.C. and attempted to drag him outside. Clark and Stein forced B.C. into a chair and Stein slapped B.C. in the back of the head again. Stein pointed her finger at B.C. and in the video appears to be yelling at him. Stein backhanded B.C. in the mouth and slapped him in the face. Stein forcefully grabbed B.C. by the ear. (Ex. 15 at 77-78; Ex. 16; Video Ex. File No. 7.)

➤ Video file 8 immediately follows video 7 and shows Stein followed B.C. into the kitchen and shoved him and grabbed him by the back of the neck. Clark and another person surround B.C. and also attempt to grab his arms. Stein appears to pull B.C.'s hair and/or flick at his neck. (Ex. 15 at 77-78; Ex. 16; Video Ex. File No. 8.)

{¶ 8} McCombs removed B.C. from CDC in September 2018.[1] B.C. currently lives in an apartment and has one of two independent care providers with him at all times, one of whom is McCombs. McCombs left her job as a hospital administrator earning approximately $89,000 per year plus bonuses to become a certified independent care provider to provide for B.C. She currently works a full-time job at a nearby hospital and then works from 5:00 p.m. to 6:00 a.m. every weekday and all weekend as an independent care provider for B.C. A second independent care provider works from 6:00 a.m. to 5:00 p.m. every weekday.

---

[1] There are two dates in the transcript regarding B.C.'s discharge date, September and December 2018.

{¶ 9} As a result of the investigation, TPWs Frattali and Jasielum received five-day suspensions. TPWs Stein, Kuczmarski, Baker, and Clark were terminated. Stein was ultimately convicted and sent to prison for 54 months as a result of the abuse.

{¶ 10} McCombs filed a complaint in the Court of Claims asserting claims for respondeat superior, negligent supervision, and loss of consortium. After a trial on the issues of liability and damages, concurrent with an immunity determination pursuant to R.C. 2743.02(F), the Court of Claims determined the employees were immune from liability. Further, the court determined the state of Ohio was liable on McCombs' abuse and neglect claim and awarded $16,125 in damages, an amount which includes the filing fee. Finally, the court found in favor of ODDD on McCombs' loss of consortium claim.

## II. Assignments of Error

{¶ 11} McCombs appeals and assigns the following three assignments of error for our review:

> [I.] The trial court erred by applying the incorrect legal standard to its assessment of damages. The Appellant, Jerri McCombs, respectfully submits that this Honorable Court should establish the following standard for any civil case involving the assessment of damages when a victim cannot, because of an intellectual or emotional disability, communicate via conventional means: In such cases, *the law should presume that the disabled individual experienced the same harms and losses that would have been experienced by an individual without the disability and award damages accordingly*. The trial court did not follow that legal standard. Alternatively, if the trial court followed the correct legal standard, then its award of damages was against the manifest weight of the evidence.
>
> [II.] The trial court erred by applying *Hutchings v. Childress*, 119 Ohio St.3d 486, 2008-Ohio-4568, 895 N.E.2d 520 to the facts of this case. Ms. McCombs respectfully submits that *Hutchings* cannot apply to the facts of this case because the State of Ohio holds a virtual monopoly over the provision of services to developmentally disabled individuals like [B.C.]. Because that is so, Ms. McCombs faced a choice: (1) upend her entire life to care for her son herself or (2) leave him in the exclusive care of individuals supervised by the Ohio Department of Developmental Disabilities, the very entity that had just abused her son over and over and over again.

Under those circumstances, economic damages for loss of consortium should be available.

[III.] The trial court erred by failing to address Ms. McCombs' claim against the State of Ohio for lack of supervision.

(Emphasis sic.) ODDD has filed a cross-appeal and brings the following four assignments of error for our review:

I. The trial court erred as a matter of law by determining that the criminal and abusive and neglectful acts of TPW staff involving [B.C.] were immune from liability.

II. The trial court's finding that the criminal and abusive and neglectful acts of TPW staff were done to control [B.C.'s] behaviors is against the manifest weight of the evidence.

III. The trial court erred as a matter of law by failing to apply the correct legal standard for an award of damages involving pain and suffering.

IV. The trial court's award of damages involving pain and suffering is against the manifest weight of the evidence.

## III. Analysis

### A. ODDD's First and Second Assignments of Error

{¶ 12} For ease of discussion, we initially address ODDD's first and second assignments of error. ODDD contends the Court of Claims erred as a matter of law by determining the criminal, abusive, and neglectful acts of TPW staff involving B.C. were immune from liability and the finding that these acts were done to control B.C.'s behaviors is against the manifest weight of the evidence.

{¶ 13} R.C. 9.86 provides the civil liability of state officers and employees, as follows: "no officer or employee shall be liable in any civil action that arises under the law of this state for damage or injury caused in the performance of [their] duties." A state employee may be subject to personal liability if their "actions were manifestly outside the scope of [their] employment or official responsibilities, or unless the officer or employee acted with malicious purpose, in bad faith, or in a wanton or reckless manner." R.C. 9.86.

{¶ 14} R.C. 2743.02(F) sets forth the procedure for determining the immunity provided in R.C. 9.86 and provides, as follows:

> A civil action against an officer or employee, as defined in section 109.36 of the Revised Code, that alleges that the officer's or employee's conduct was manifestly outside the scope of the officer's or employee's employment or official responsibilities, or that the officer or employee acted with malicious purpose, in bad faith, or in a wanton or reckless manner shall first be filed against the state in the court of claims that has exclusive, original jurisdiction to determine, initially, whether the officer or employee is entitled to personal immunity under section 9.86 of the Revised Code and whether the courts of common pleas have jurisdiction over the civil action.

{¶ 15} The question of whether an employee is entitled to immunity as a governmental employee is a question of law. *Conley v. Shearer*, 64 Ohio St.3d 294, 292 (1992). The Court of Claims has exclusive original jurisdiction over that issue. R.C. 2743.02; *Poe v. Univ. of Cincinnati*, 10th Dist. No. 12AP-929, 2013-Ohio-5451, ¶ 7. Whether an individual acted manifestly outside the scope of employment is a question of fact. *Theobald v. Univ. of Cincinnati*, 111 Ohio St.3d 541, 2006-Ohio-6208, ¶ 14, citing *Hopper v. Univ. of Cincinnati*, 10th Dist. No. 99AP-787 (Aug. 3, 2000). An appellate court will not reverse a judgment as being against the manifest weight of the evidence if some competent, credible evidence supports all the essential elements of the case. *Coffman v. Mansfield Corr. Inst.*, 10th Dist. No. 09AP-447, 2009-Ohio-5859, ¶ 10.[2]

{¶ 16} The Court of Claims uses a two-step process to determine whether an individual is entitled to immunity under R.C. 9.86. First, the court determines whether the individual was a state officer or employee, and second, the court determines whether the individual was acting within the scope of their employment when the cause of action arose. *Marotto v. Ohio State Univ. Med. Ctr.*, 10th Dist. No. 14AP-303, 2014-Ohio-4549, ¶ 14, citing *Theobald* at ¶ 14.

---

[2] In addition, App.R. 12(C)(1) states: "In any civil action or proceeding that was tried to the trial court without the intervention of a jury, and when upon appeal a majority of the judges hearing the appeal find that the judgment or final order rendered by the trial court is against the manifest weight of the evidence and have not found any other prejudicial error of the trial court in any of the particulars assigned and argued in the appellant's brief, and have not found that the appellee is entitled to judgment or final order as a matter of law, the court of appeals shall reverse the judgment or final order of the trial court and either weigh the evidence in the record and render the judgment or final order that the trial court should have rendered on that evidence or remand the case to the trial court for further proceedings."

{¶ 17} There is no question in this case that the individuals were state employees, the issue is whether they were acting within the scope of their employment. The Ohio Revised Code does not define "scope of employment." "The concept generally denotes an agency relationship in which the agent or employee is engaged in an activity that is logically related to the business of the principal or employer. * * * For purposes of personal immunity under R.C. 9.86, a state employee acts within the scope of employment if the employee's actions are 'in furtherance of the interests of the state.' " *Theobald* at ¶ 15, quoting *Conley* at 287.

{¶ 18} In this case, the Court of Claims determined that Stein and Kuczmarski abused B.C. The court also determined that abuse incidents which were witnessed and not reported amounted to neglect. The court further found that in each instance of abuse, Stein or Kuczmarski was engaged in their client monitoring function or performed the abuse in an attempt to control B.C.'s behavior. Further, the court found that the failure of the other TPWs to report the abuse also fell within the scope of their employment.

{¶ 19} "[I]n order for an employer to be liable under the doctrine of respondeat superior, the tort of the employee must be committed within the scope of employment. Moreover, where the tort is intentional, * * * the behavior giving rise to the tort must be 'calculated to facilitate or promote the business for which the servant was employed.' " *Byrd v. Faber*, 57 Ohio St.3d 56, 58 (1991), quoting *Little Miami RR. Co. v. Wetmore*, 19 Ohio St. 110, 132 (1869). In order for an act to be outside the scope of employment, "[t]he act must be so divergent that it severs the employer-employee relationship." *Elliott v. Ohio Dept. of Rehab. & Corr.*, 92 Ohio App.3d 772, 775 (10th Dist.1994), citing *Thomas v. Ohio Dept. of Rehab. & Corr.*, 48 Ohio App.3d 86, 89 (10th Dist.1988).

{¶ 20} CDC Superintendent Ballinger testified that CDC developed a behavior support strategy that identified some of B.C.'s target behaviors, including physical aggression, self-injurious behavior, and taking property, which consisted of mainly food and beverages. The behavioral support strategies document identifies B.C.'s target behaviors and provides recommended strategies to create a supportive environment for B.C. The document only provides for physical restraint in circumstances of imminent threat of harm in order to address and mitigate the risk of harm, not to control B.C.'s behavior. In all the videos, one can see that each incident is precipitated by B.C.'s behavior,

all of which fall within the identified target behaviors. For example, on June 9, 2018, B.C. was in the dining room and grabbed Stein's keys. It was only after B.C. took the keys that Stein responded by using her right hand to choke B.C. B.C.'s target behavior identified as taking other's property was identified in his person-centered plan. Each incident of abuse began with B.C.'s behavior and the staff responding to his target behavior. In each instance, the TPW was engaged in their client monitoring function and performed the abuse in an attempt to control B.C.'s target behavior. Consequently, although the degree and nature of force employed markedly differed from the recommended strategies, the force used was in furtherance of CDC's interest in controlling B.C.'s target behavior as identified in the behavioral support strategies document. This court has stated "a trial court can properly find that even a reckless act was performed in the course of employment and in furtherance of the employer's interest." *Elliott* at 776. Therefore, some competent, credible evidence supported the Court of Claims' finding that the TPWs' abusive and neglectful acts were not manifestly outside the scope of employment. Because such finding was not against the manifest weight of the evidence, the Court of Claims did not err in concluding that the TPWs were entitled to immunity. ODDD's first and second assignments of error are overruled.

## B. McCombs' First Assignment of Error and ODDD's Third and Fourth Assignments of Error

{¶ 21} Because these assignments of error are related, we address McCombs' first assignment of error and ODDD's third and fourth assignments of error together. In these assignments of error, both McCombs and ODDD argue the Court of Claims applied an incorrect legal standard in assessing damages. McCombs suggests that this court adopt a new standard. McCombs and ODDD both argue the award of damages was against the manifest weight of the evidence.

### 1. Court of Claims' Award of Damages

{¶ 22} The Court of Claims awarded McCombs $16,100 in damages and in so doing applied the following standard in assessing legal damages:

> [I]n assessing damages for each incident of abuse, the Court has applied a two-step process: (1) objectively observe the incident and determine the nature and extent of the abuse incurred; then (2) apply a subjective, reasonably prudent

person standard as to the pain and suffering incurred as a
result of the abuse observed.

(Decision at 13-14.)

### 2. **Summary of Arguments in Support of the Assignments of Error**

{¶ 23} The Court of Claims pointed to no authority to support this standard for assessing damages. ODDD argues the court "invented" this two-step process. (ODDD's Brief at 39.) ODDD does not, however, propose an alternative standard. Rather, ODDD argues the standard applied by the Court of Claims was erroneous because it resulted in a damages determination that is a guestimate, speculative, not ascertainable with reasonable certainty and did not require proof of a reasonable degree of probability or certainty. In support, ODDD points to non-binding cases from the Fourth, Seventh, Eighth, and Eleventh Districts which addressed issues and facts not relevant to the case before us.[3] McCombs also argues the standard applied by the Court of Claims was erroneous; however, McCombs argues the court's standard was erroneous because the court "was incorporating [B.C.'s] disability into this standard and using that disability against him to reduce his damages." (McCombs' Brief at 31.)

### 3. **Standard of Review**

{¶ 24} The question of whether the Court of Claims applied the correct legal standard for assessing damages is subject to a de novo review. The question of whether the Court of Claims' determination of the existence and amount of damages was against the manifest weight is subject to a different standard of review. In *Fisher v. Univ. of Cincinnati Med. Ctr.*, 10th Dist. No. 14AP-188, 2015-Ohio-3592, we held:

"In order to set aside a damage award as inadequate and against the manifest weight of the evidence, a reviewing court

---

[3] In *Bevens v. Wooten Landscaping, Inc.*, 4th Dist. No. 11CA819, 2012-Ohio-5137, the Fourth District Court of Appeals addressed the proper measure of damages for a contractor's breach of its implied duty to perform in a workmanlike manner. In *Marzullo v. J.D. Pavement Maintenance*, 8th Dist. No. 96221, 2011-Ohio-6261, ¶ 40, the Eighth District Court of Appeals addressed the extent of evidence required to support future or permanent economic and pain and suffering damages for a negligence claim. In *Barker v. Sundberg,* 11th Dist. No. 92-A-1756 (Oct. 25, 1993), the Eleventh District Court of Appeals addressed the extent of evidence required to support an award of damages for economic damages in the form of lost wages and impairment of earning capacity. In *Glenwood Homes, Ltd. v. State Auto Mut. Ins. Co.,* 8th Dist. No. 72856 (Oct. 1, 1998), the Eighth District Court of Appeals addressed the proper measure of damages for a construction breach of contract claim. In *E. Liverpool v. Buckeye Water Dist.*, 7th Dist. No. 08 CO 19, 2010-Ohio-3170, ¶ 72, the Seventh District Court of Appeals addressed the measure of damages for lost profits in a breach of contract case.

must determine that the verdict is [1] so gross as to shock the sense of justice and fairness, [2] cannot be reconciled with the undisputed evidence in the case, or [3] is the result of an apparent failure by the jury to include all the items of damage making up the plaintiff's claim. *Bailey v. Allberry*, 88 Ohio App.3d 432, 435, 624 N.E.2d 279 (2d Dist.1993)."

An appellate court cannot reverse the judgment of the trial court if that judgment is supported by competent, credible evidence. *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279 (1978), syllabus. "However, if the judgment is against the manifest weight of the evidence and is so grossly inadequate that it shocks the conscience and constitutes an abuse of discretion, this court cannot allow the judgment to remain undisturbed." *O'Neil v. State*, 13 Ohio App.3d 320, 321 (10th Dist.1984).

*Id*. at ¶ 14-15, quoting *Staley v. Allstate Property Cas. Ins. Co.*, 10th Dist. No. 12AP-1085, 2013-Ohio-3424, ¶ 11.

### 4. **Damages Sought**

{¶ 25} The amended complaint alleges several types of damages suffered by B.C.:

> ➤ (1) Severe emotional distress, embarrassment, anguish, and humiliation experienced at the time B.C. was neglected and abused ("Emotional distress damages");

> ➤ (2) Severe emotional distress, embarrassment, anguish, and humiliation that B.C. will continue to experience in the future ("Future emotional distress damages");[4] and

---

[4] Paragraph 20 of the amended complaint avers that as a direct and proximate result of the wrongful conduct of ODDD, B.C. "has suffered severe emotional distress, embarrassment, anguish, and humiliation, *which will continue on an ongoing basis into the future*." (Emphasis added.) Notwithstanding, in her brief McCombs states "[i]mportantly, the only damages sought here were for [B.C.'s] *past* physical, mental, and emotional anguish." (Emphasis added.) (McCombs' Brief at 29.) However, with regard to future damages, we note in *Hohn v. Ohio Dept. of Mental Retardation & Dev. Disabilitie*s, 10th Dist. No. 93AP-106 (Dec. 14, 1993), this court held:

 The recovery of future damages in a negligence action is limited to those damages reasonably certain to result from the injury suffered. *Powell v. Montgomery* (1971), 27 Ohio App.2d 112. Where the injury is not objective or obvious, the plaintiff must present expert testimony as to probability of the permanency of the injury. * * * Future damages will not be awarded if there is only the mere speculation or possibility that the damages will occur. * * * Under the foregoing standard, plaintiffs can only recover the additional future economic damages they seek if it is reasonably certain from the record that Hohn will incur the additional medical costs alleged.

➤ (3) Physical pain ("Physical pain damages").

(*See* Am. Compl. at ¶ 20-21.)

**{¶ 26}** All three types of damages sought by McCombs are considered to be non-economic compensatory damages.[5]   Non-economic compensatory damages are to be distinguished from economic compensatory damages, and compensatory damages are to be distinguished from punitive and exemplary damages.  McCombs does not seek economic compensatory damages or punitive damages for B.C.'s pain and suffering.

### 5.  <u>**Nature of Non-Economic Compensatory Damages—Pain and Suffering**</u>

**{¶ 27}** In *Fantozzi v. Sandusky Cement Prods. Co.*, 64 Ohio St.3d 601, 612-15 (1992), the Supreme Court of Ohio addressed the nature of compensatory damages and the difficulty in assessing compensatory damages for non-economic damages such as pain and suffering:

> The fundamental rule of the law of damages is that the injured party shall have compensation for all of the injuries sustained. * * * Compensatory damages are intended to make whole the plaintiff for the wrong done to him or her by the defendant. * * * Compensatory damages are defined as those which measure the actual loss, and are allowed as amends therefor. For example, compensatory damages may, among other allowable elements, encompass direct pecuniary loss, such as hospital and other medical expenses immediately resulting

---

Furthermore, in *Day v. Gulley*, 175 Ohio St. 83, 86 (1963), the Supreme Court of Ohio held:

> The question for this court to determine is whether there must be expert evidence as to future pain or suffering, permanency of injuries or lasting impairment of health, where the injury is subjective in character.

> The general rule on the subject is stated, as follows, in the annotation, 115 A. L. R., 1149, at page 1150:

> "* * * That is, if the injury is of an objective nature (such as the loss of an arm, leg, or other member) the jury may draw their conclusions as to future pain and suffering from that fact alone (the permanency of such injury being obvious); whereas there must be expert evidence as to future pain and suffering or permanency where the injury is subjective in character." See, also, 15 American Jurisprudence, 815, Damages, Section 377.

[5] R.C. 2315.18(H); 2323.43(H)(3); 2744.05.

from the injury, or loss of time or money from the injury, loss due to the permanency of the injuries, disabilities or disfigurement, and physical and mental pain and suffering. See 4 Restatement of the Law 2d, Torts (1965), Section 903 et seq. These among other elements of damages are well known in Ohio jurisprudence and are allowable elements to be assessed by the jury. Some of these elements of damages, such as the costs and expenses of the injury and loss of time from employment, entail only the rudimentary process of accounting to calculate. Other elements such as pain and suffering are more difficult to evaluate in a monetary sense. The assessment of such damage is, however, a matter solely for the determination of the trier of fact because there is no standard by which such pain and suffering may be measured. In this regard, this court has recognized that "no substitute for simple human evaluation has been authoritatively suggested." *Flory v. New York Central RR. Co.* (1959), 170 Ohio St. 185, 190, 10 O.O.2d 126, 128, 163 N.E.2d 902, 905.

* * *

One of the elements of compensatory damages that is universally allowed in actions for personal injuries is the pain and suffering endured by the plaintiff as a result of the injury. In addition to compensation for the physical pain, the jury is permitted to award compensation for the mental suffering endured. See *Smith v. Pittsburg[h], Fort Wayne & Chicago Ry. Co.* (1872), 23 Ohio St. 10, 18-19; *Flory v. New York Central RR. Co.*, supra.

In Black's Law Dictionary (6 Ed. 1990) 1109, we find that "pain and suffering" is a "term used to describe not only physical discomfort and distress but also mental and emotional trauma which are recoverable as elements of damage in torts. * * *["]

Generally, pain and suffering has been viewed as a unitary concept. Accordingly, it was stated in *Capelouto v. Kaiser Found. Hosps.* (1972), 7 Cal.3d 889, 892-893, 103 Cal.Rptr. 856, 859, 500 P.2d 880, 883, that: "In general, courts have not attempted to draw distinctions between the elements of 'pain' on the one hand, and 'suffering' on the other; rather, the unitary concept of 'pain and suffering' has served as a convenient label under which a plaintiff may recover not only for physical pain but for fright, nervousness, grief, anxiety, worry, mortification, shock, humiliation, indignity,

embarrassment, apprehension, terror or ordeal." (Footnote omitted.)

In Ohio, an action in tort may allege, and proof may be offered on both pain from physical injuries and suffering from mental or emotional disturbance. However, in Ohio there need not be a contemporaneous physical injury in order to allege damages for emotional distress. *Schultz v. Barberton Glass Co.* (1983) 4 Ohio St.3d 131, 4 OBR 376, 447 N.E.2d 109, syllabus; *Paugh v. Hanks* (1983), 6 Ohio St.3d 72, 6 OBR 114, 451 N.E.2d 759, paragraph two of the syllabus.

As noted, case law generally and repeatedly refers to "pain and suffering" as an element of damages that is recoverable in Ohio.

{¶ 28} In *Flory v. New York Cent. RR. Co.*, 170 Ohio St. 185, 190 (1959), the Supreme Court observed: "Of all the items of compensatory damages which it may become the duty of a court or jury to assess, that which will compensate for human pain and suffering is perhaps the most difficult to determine. Such determination is susceptible of no mathematical or rule of thumb computation, and no substitute for simple human evaluation has been authoritatively suggested."

{¶ 29} As this court stated in *Kelly v. Northeastern Ohio Univ. College*, 10th Dist. No. 07AP-945, 2008-Ohio-4893, citing *Fantozzi*, *Flory*, and other case law:

An appellate review of the adequacy of a trial court's award for noneconomic damages, or pain and suffering, is difficult because no specific yardstick, or mathematical rule exists for determining pain and suffering. Rather, the finder of fact makes a "human evaluation" of all the *facts and circumstances involved*. In reviewing the reasonableness of a pain and suffering award, a court may consider awards given in comparable cases as a point of reference, but ultimately must evaluate each case *in light of its own particular facts*. Given the difficulty in calculating pain and suffering damages, reviewing courts generally defer such determinations to the trier of fact, and are reluctant to substitute their judgment. Indeed, in no other element of damages is there so wide a latitude for awards as in pain and suffering.

(Emphasis added.) (Citations omitted.) *Id.* at ¶ 8, quoting *Hohn*.

### 6.  Court of Claims' Erroneous Invented Standard for Assessing Damages

{¶ 30} With all this in mind, we agree with ODDD that the Court of Claims appears to have invented a standard for assessing damages.  We acknowledge, however, that McCombs asks us to do the same, albeit suggesting a different invented standard.  Although we decline to adopt either standard, we appreciate and understand the Court of Claims' and the parties' challenge in determining and proposing a correct standard for assessing damages for pain and suffering and in applying such a standard.  Nevertheless, notwithstanding the challenge of assessing pain and suffering, physical and emotional, where a plaintiff cannot verbally express the same, we agree with McCombs that in applying its invented standard of objective observation and subjective assessment, the Court of Claims used B.C.'s disability (in particular, being non-verbal) against him to reduce his damages.

### 7.  Court of Claims' Award of Damages Against the Manifest Weight of the Evidence

{¶ 31} Furthermore, we find to be against the manifest weight of the evidence the Court of Claims' findings that: (1) "[B.C.] is unable to articulate pain, discomfort, suffering, or emotional distress"; (2) the videotapes "do not reflect visible signs of pain or discomfort that [B.C.] suffered as a result of each instance of abuse"; (3) "there is no evidence that [B.C.] suffered any emotional distress, present or future, for any act of abuse"; and (4) "[t]here is no evidence that after any incident of abuse, or the collective incidents, [B.C.] had any emotional discomfort continuing to reside at CDC."  (Decision at 13.)

{¶ 32} In a case such as the one before us, where a plaintiff cannot verbally express pain and suffering,[6] it is incumbent upon the factfinder to pay special attention to evidence which reveals the plaintiff's alternative expressions or manifestations of pain and suffering. Here, McCombs explained the condition B.C. has which results in his being non-verbal:

> Q. I want to follow up on something that you said about [B.C.] being nonverbal and that despite all of his capabilities you can't talk to him.
>
> What does that mean? Like tell us about that part of him.

---

[6] Whether due to infancy, impairment, disability, dementia or otherwise.

A. I'm sorry, can you say it differently.

Q. Yeah, when you say he's nonverbal and you can't talk to him, tell us how you know that. What is it about him that prevents you from having a conversation with him sort of like the two of us are right now?

A. His disability is, the nonverbal parts, getting into the science of it, there's diagnoses called dyspraxia, apraxia. It's cognitively where ideas come in your head, but you can't -- they don't connect to come out your mouth, to articulate.

So [B.C.] makes his needs very clear. You can talk to him, but you can't have conversations. They're one-sided because he can't have [a] conversation back with you.

(Tr. Vol. I at 168-69.)

{¶ 33} Furthermore, CDC Psychologist Harger, CDC Special Team reports and Bachmann's investigation reports provided evidence that while B.C. rarely speaks, he "uses simple signs, facial expressions, gestures, [and] body language" to communicate. (Pltf.'s Ex. No. 31 at 233 and 255.)

{¶ 34} Contrary to the Court of Claims' findings, the record contains the following evidence[7] revealing B.C.'s expressions of pain and suffering via facial expressions, gestures, and body language:

> ➢ Video Exhibit File No. 1: during the June 9, 2018 incident, the video reveals B.C. contorting his body to evade Stein as she chokes him and raising his arm to deflect Stein. B.C. also increases the pace of his steps backwards to escape. B.C. rubs his neck;

> ➢ Video Exhibit File No. 2: during the June 20, 2018 12:32 p.m. incident, the video reveals B.C. retreating backwards, recoiling and using his hand to deflect Stein as she chokes him;

> ➢ Plaintiff's Exhibit No. 1 at 7: the Report of Investigation completed by Bachmann reveals that on June 20-21, 2018 "similar instances are observed with [B.C.]

---

[7] This summary of evidence focuses on B.C.'s reaction, expressed through his facial expressions, gestures, and body movements, to the neglect and abuse perpetrated by Stein and the other TPWs; whereas the summary of evidence at paragraph 7 focuses on the actions of Stein and the other TPWs in perpetrating the neglect and abuse.

exiting his room before Stein and left hurriedly while holding his right hand to his head and looking back at Stein who exited a few steps behind." Bachmann further reported that "[v]ideo evidence also adds to additional suspicious behaviors from Stein such as going into his bedroom on multiple occasions while staff report that he is independent in his room with times going to his room following stealing water or food items from Stein and/or is observed leaving his bedroom quickly while covering his head with Stein following him." (Pltf.'s Ex. No. 1 at 16.)

➢ Video Exhibit File No. 5: during the June 21, 2018 7:31 a.m. incident, the video reveals B.C. using his arms twice to deflect Stein and Baker as they grab him and attempt to drag him. He uses his arm to try to yank away from them;

➢ Video Exhibit File No. 3: during the June 21, 2018 8:12 a.m. incident, the video reveals B.C. slow to walk away after Stein slaps him;

➢ Video Exhibit File No. 4: during the June 21, 2018 8:32 a.m. incident, the video reveals B.C. trying to use both his arms to deflect Stein and the other CDC employee as they have him pinned against the wall. B.C. is hunched over and turned to the side in a protective stance. After the other CDC employee retrieves the paper B.C. is holding, B.C. is released and pushed in the back by the other CDC employee and B.C. lurches forward. Stein and the other CDC employee continue pushing B.C. around the tables and B.C. makes an angry arm gesture trying to get away. He has a distraught look on his face. Again he is pinned against the wall and he uses his arms to cross his chest. When Stein and the other employee are trying to trap him with a chair, B.C.'s brow is furrowed. Stein knees B.C. in the groin as he is backing away into the camera;

➢ Video Exhibit File No. 7: during the June 26, 2018 7:42 a.m. incident, the video reveals B.C. recoiling backwards to evade Stein after she slaps him on the back of his head and puts her finger in his face. Again he leans away as she slaps him, slaps the back of his head, pulls and yanks his ear;

&gt; Video Exhibit File No. 8: during the June 26, 2018 8:04 a.m. incident, the video reveals B.C. using his arms to evade Stein as she is pulling him, pinching/flicking the back of his head. He hunches his shoulders as wincing and protecting himself. He has an alarmed and scared look on his face.

&gt; Bachmann's report observed "Steins actions toward [B.C.] were with enough force that could reasonably be expected to result in physical harm, particularly choking and hitting a client on the head who is diagnosed with traumatic brain injury and seizure disorder." (Pltf.'s Ex. 1 at 16.)

{¶ 35} Furthermore, in a case such as the one before us, where the plaintiff cannot verbally express pain and suffering, it is also incumbent upon the factfinder to pay special attention to evidence of the context and circumstances within which the plaintiff experiences the abuse and neglect. Evidence of the context and circumstances may be considered in making findings of the existence and/or amount of pain and suffering damages in particular in the nature of emotional distress, such as humiliation and fear. As we stated in *Hohn*, the factfinder must evaluate the case "in light of its own particular facts." *Id.* at 10. Here, the evidence reveals that the context and circumstances, the particular facts of this case, were that B.C. experienced the neglect and abuse as a very vulnerable person— with a diagnosis of autism and being non-verbal, among others. B.C. was entrusted to the care of CDC by McCombs, his mother and guardian. On B.C.'s behalf, McCombs signed a document titled "client rights and individual complaint procedure" with one of the enumerated rights listed as "[h]ave a clean *safe* place to live." (Emphasis added.) B.C. was neglected and abused in the facility where he lived—his "home"—by those persons whose responsibility it was to care for him. Ballinger testified that "prevention of abuse is everyone's job at the facility." (Tr. Vol. I at 51.) Ballinger confirmed that the CDC incident reporting procedures policy contains the following statement: "Abuse is defined as the willful infliction of injury, unreasonable confinement, intimidation or punishment with the resulting physical harm, pain or personal anguish. Injury does not need to be present as assess [sic] the emotional trauma/personal anguish. Also, since many individuals are unable to communicate feelings of fear, humiliation, etc. the assumption must be made that any actions that would usually be viewed as psychologically or verbally abusive by a

member of the general public, is also viewed as abusive by the individual residing in the facility, regardless of the individual's perceived ability to comprehend the nature of the incident." (Deft.'s Ex. C at 201; Tr. Vol. I at 153.)

### 8. Sustain Assignments of Error and Instructions on Remand

{¶ 36} Therefore, we find that in assessing damages the Court of Claims applied an incorrect standard which used B.C.'s disability (in particular, being non-verbal) against him to reduce his damages. We further find the Court of Claims' award of damages cannot be reconciled with the undisputed evidence in the case, failed to include all the items of damages making up McCombs' claim, and was so grossly inadequate as to shock the sense of justice and fairness and the conscience. Accordingly, we sustain McCombs' first assignment of error and ODDD's third and fourth assignments of error (albeit for reasons other than those suggested by ODDD). On remand, the Court of Claims, as the factfinder in this case, in determining the existence and amount of damages shall make a human evaluation of all the facts and circumstances involved and evaluate this case in light of its own particular facts—paying special attention to evidence: (1) which reveals B.C.'s alternative expressions or manifestations of pain and suffering, and (2) of the context and circumstances within which B.C. experienced the abuse and neglect.

### C. McCombs' Second Assignment of Error

{¶ 37} In her second assignment of error, McCombs contends the Court of Claims erred by applying *Hutchings v. Childress*, 119 Ohio St.3d 486, 2008-Ohio-4568, to the facts of this case and economic damages for loss of consortium should be available to her. McCombs only sought economic damages through her loss of consortium claim.

{¶ 38} In *Hutchings*, the appellant was injured in an automobile accident caused by the appellee and sustained a traumatic brain injury. The appellant filed a claim for her injuries and her husband filed a claim for loss of consortium. The appellant's husband functioned as a caregiver for his wife after the accident and presented evidence that his time missed from work would produce an income gap of between $1,775,000 and $2,296,000 over his expected work life. The Supreme Court determined that "[i]f there is to be recovery of lost income, it cannot be a part of the uninjured spouse's claim for loss of consortium. A claim for loss of consortium is not based upon economic damages. 'Consortium consists of society, services, sexual relations and conjugal affection which includes companionship,

comfort, love and solace.' *Clouston v. Remlinger Oldsmobile Cadillac, Inc.* (1970), 22 Ohio St.2d 65, * * * syllabus." *Hutchings* at ¶ 16. A loss of consortium claim is based on the loss of services provided by the injured party prior to the injury, and a loss of income by the caregiver is not a service that the injured party once provided. *Id.* The court concluded that "[t]he appropriate measure of damages for an uninjured spouse's provision of care to an injured spouse is the economic value of the care provided, not the value of the lost wages incurred in providing that care." *Id.* at ¶ 44.

{¶ 39} In this case, McCombs seeks to carve out an exception to *Hutchings* because ODDD holds a monopoly over the provision of services to developmentally disabled individuals and, therefore, her choices are limited to providing care herself or leave him in the exclusive care of individuals supervised by ODDD, the very entity that abused her son. However, seeking economic damages for McCombs' loss of wages pursuant to loss of consortium claim does not differ from *Hutchings* in the fact that B.C. did not previously provide those wages, it was McCombs who provided the wages. A loss of consortium claim is a derivative claim. *Canfield v. United Airlines, Inc.*, 10th Dist. No. 21AP-252, 2021-Ohio-4460, ¶ 23, quoting *Bowen v. Kil-Kare, Inc.*, 63 Ohio St.3d 84, 92-93 (1992) (" '[A] claim for loss of consortium is derivative in that the claim is dependent upon the defendant's having committed a legally cognizable tort upon the spouse who suffers bodily injury.' "); *Gordon v. Ohio State Univ.*, 10th Dist. No. 10AP-1058, 2011-Ohio-5057, ¶ 80. McCombs' loss of consortium claim is only proper for a loss of society, services, companionship, comfort, love, and solace from B.C. Applying *Hutchings*, the appropriate measure of damages for McCombs' provision of care to B.C. would be the economic value of the care provided, not the value of the lost wages incurred in providing that care. *Hutchings* at ¶ 44. McCombs does not seek such economic damages and testified that Medicaid paid the expenses for B.C. to stay at CDC, and ODDD currently pays the independent care providers.[8] (Tr. Vol. I, 182; 242.) Therefore, we cannot find the Court of Claims erred in applying *Hutchings* to conclude that McCombs was not entitled to economic damages under her loss of consortium claim. McCombs' second assignment of error is overruled.

---

[8] McCombs testified that due to the staffing shortage in Belmont County, there are no other independent care providers to hire to care for B.C.

**D. McCombs' Third Assignment of Error**

{¶ 40} McCombs' third assignment of error raises the issue that the Court of Claims erred in failing to address her claim for lack of supervision. The court provided that "[b]ecause the Court has found Defendant liable for the abuse and neglect via respondeat superior, the Court will not analyze whether Defendant is liable under a negligent hiring, training, or supervision theory." (Decision at 10.) McCombs' counsel stated during oral argument that the assignment of error is more in the nature of a cross-assignment of error if this court were to determine Stein and the other TPWs were not immune from liability— in other words, if we were to sustain ODDD's first and second assignments of error. McCombs does not seek to alter the judgment of ODDD liability. McCombs nevertheless urges this court to require a finding with regard to the negligent hiring, training, and supervision claim in order to hold CDC supervisors accountable. McCombs counsel conceded, however, that regardless of the theory of liability, the damages would be the same.

{¶ 41} Because McCombs' third assignment of error does not seek to change the Court of Claims' judgment of ODDD liability but, rather, seeks an additional finding to support the judgment of liability, we decline to consider the same and determine the third assignment of error to be moot. *See Ra v. Ohio Atty. Gen. Office*, 10th Dist. No. 19AP-533, 2020-Ohio-1346, ¶ 35, citing *Fowler v. Ohio Dept. of Pub. Safety*, 10th Dist. No. 16AP-867, 2017-Ohio-7038, ¶ 4, 23. *See also* App.R. 12(A)(1)(c); *Sourial v. Nationwide Mut. Ins. Co.*, 10th Dist. No. 17AP-731, 2018-Ohio-2528, ¶ 61; *Ra* at ¶ 35 ("[T]o the extent [the] appellee's cross-assignments of error do not seek to change the trial court judgment but, rather, offer arguments in support of alternative reasons to affirm the trial court's judgment under App.R. 3(C)(2), we find such arguments to be moot considering our resolution of [the] appellants' first and second assignments of error. Accordingly, we need not pass on the propriety or merits of [the] appellees' three cross-assignment[s] of error in this regard.").

**IV. Conclusion**

{¶ 42} For the foregoing reasons, we sustain McCombs' first assignment of error and ODDD's third and fourth assignments of error, overrule McCombs' second assignment of error, decline to consider McCombs' third assignment of error and render it moot, and overrule ODDD's first and second assignments of error. Therefore, we affirm in part and

reverse in part the judgment of the Court of Claims of Ohio and remand the matter to that court for further proceedings in accordance with law and consistent with this decision.

*Judgment affirmed in part;*
*reversed in part; and cause remanded.*

LUPER SCHUSTER, P.J., and JAMISON, J., concur.

_____